[Civ. No. 4988. Second Appellate District, Division One.—February 24, 1928.]

H. F. FITES COMPANY (a Corporation), Respondent, v. HARRIS MANUFACTURING COMPANY (a Corporation), Appellant.

Parkinson & Parkinson for Appellant.

M. C. Atchison and J. W. Hocker for Respondent.

HAHN, J., *pro tem.*—This appeal comes to us from a judgment rendered by the superior court, in and for the county of Imperial, in an action wherein the plaintiff and respondent brought suit to recover a judgment against defendant and appellant. The complaint contains two counts. The first alleges that a contract of employment was entered into during the month of February, 1922, whereby the defendant employed the plaintiff to act as its agent, salesman, and representative in the county of Imperial to find purchasers for combined harvesters manufactured by the defendant corporation, and as compensation for such services agreed to pay plaintiff fifteen per cent commission on all combined harvesters manufactured by the defendant and sold to persons procured by the plaintiff; that pursuant to said contract of employment plaintiff secured purchasers for four harvesters, for which the defendant received the sum of $11,750, and that the sum of $1,762.50 was still owing to the plaintiff from the defendant as commissions on said sales.

The second count sounds in *quantum meruit,* and alleges that at the special instance and request of the defendant the plaintiff performed services for the defendant in the sale of its harvesters, and that the reasonable value of said services is and was the sum of $1,762.50. This count is based upon the same claim forming the foundation for count one.

The court found as true the allegations contained in both counts of the complaint, but judgment was entered for only $1,762.50. From the judgment entered upon these findings the defendant appeals, making its principal point that the evidence is insufficient to support the findings and judgment.

It appears from the record that in February, 1922, plaintiff and defendant entered into a written agreement by the terms of which plaintiff purchased from defendant certain harvesters at specified prices, the harvesters to be delivered from time to time as requested by plaintiff during the season which, under the contract, ended on September 30, 1922. By the terms of the contract, plaintiff agreed to pay five per cent of the purchase prices for the harvesters at the time of the execution of the agreement, twenty per cent upon delivery of each machine as ordered, and the balance upon extended payments to be evidenced by interest-bearing notes executed by the plaintiff. It was further provided that during the season the plaintiff would have the sole right in Imperial County to sell the harvesters manufactured by the defendant company; also that in the event any farmer purchased a harvester from the plaintiff and was unable to pay cash for the same, the notes of such farmer given to plaintiff were to be delivered as collateral to the notes given by the plaintiff for the balance of the purchase price of the harvester owing to the defendant company from the plaintiff, or the plaintiff would accept such notes of the farmer purchaser on account of the plaintiff's obligation to the defendant when such notes were guaranteed by the plaintiff. The contract further provided that upon the final payment by plaintiff for each harvester, defendant would allow plaintiff certain discounts from the prices listed in the contract. These discounts ranged from five to fifteen per cent, depending in part upon the time of payment and also in part upon whether the defendant or plaintiff rendered certain setting up service and field inspection for the harvester after purchase by the farmer. The contract contained an explicit provision that it was to terminate on September 30, 1922.

For several years previous to 1922, similar contracts had been entered into annually by the plaintiff and the defendant, but subsequent to February, 1922, no such written contract was executed by the parties. It may be important

to note at this point that the contract of 1922, as all previous contracts, was executed on behalf of the defendant company by either its president, vice-president, or general manager, and that these contracts all contained a specific provision that no contract would be binding upon the defendant corporation unless it was executed by its president, vice-president, or general manager.

On January 4, 1923, one E. W. Fowler, who was then and for several years prior thereto had been a field agent in the employ of the defendant company, called at the place of business of plaintiff in Calexico and discussed with Howard P. Fites, the president of the plaintiff corporation, the prospects for sales of the Harris harvesters in Imperial Valley for the coming grain season. Fites was well acquainted with Fowler, having known him for several years as the field inspector for the defendant company. There is a marked conflict in the record between the testimony of Fowler and Fites as to what occurred in their conference on January 4th, but it does appear without conflict that Fowler had with him at that time a letter written directly to the defendant company at Stockton, California, by one W. I. Green, a rancher in Imperial Valley, who was the owner of a Harris harvester, and who in his letter expressed a desire to purchase a smaller harvester from the defendant company. Fites testified that at the time Fowler called he knew that Green was considering the purchase of a harvester, but had not up to that time interviewed him personally about it. Fowler expressed a desire to interview Green, and together with Fites on January 5th drove out to see Green. At that time Green expressed a desire to secure a smaller harvester, but definitely stated that he could not and would not sign up an order except upon condition that his larger machine was disposed of. Fowler and Fites talked over the possible prospects for the sale of Green's old machine, but did not secure a buyer. During the ten days following the visit to Green, Fowler and Fites visited a number of farmers in Imperial Valley in an endeavor to interest them in Harris harvesters but without any tangible results. On January 15th, Fowler alone again visited Green and induced Green to sign a written order for a new harvester, upon Fowler's agreement that this order would not be effective until he, Fowler, had found a purchaser for

Green's old harvester. This order was made out in duplicate on a form of contract which evidently had previously been used by the plaintiff company in selling the Harris harvester, and named the plaintiff company as seller and Green as buyer. No mention is made of the defendant company in the order, nor is the defendant company obligated in any way by the terms of the order. Under the provisions of the order when accepted by the plaintiff, the plaintiff company agreed to sell and deliver to Green a harvester and Green in turn agreed to pay the plaintiff company for the harvester. After securing the execution of this order in duplicate by Green, Fowler took both copies to plaintiff company. Fites was somewhat in doubt as to whether to accept the order, as he had some question as to the financial responsibility of Green. In any event, the order never was accepted by plaintiff company. On the following morning, Fowler returned to the place of business of plaintiff and secured the Green order, giving as a reason therefor that he desired to change some of its terms. A day or two later, Fowler advised Fites he had decided to recommend the firm of Dossey & Gurisch, of Brawley, as the dealers for the Harris harvester in the valley for the year 1923, and from that time Fites engaged in no activities on behalf of the sale of Harris harvesters.

It is important to note at this point that on January 4th, when Fowler first arrived in the valley, he discussed with Fites the matter of Fites Company securing a new contract from the defendant company similar to the 1922 contract. Fites in that conversation stated that he had the matter under consideration, but that he felt he would be more likely to secure such a contract if with the application for the same he would be able to send in an order for the purchase of a harvester, and in view of the fact that Green was a prospective purchaser he thought it a wiser policy to attempt to make a sale to Green and send in this order with his request for a new contract.

During the ten or eleven days that Fowler was in the valley interviewing prospective purchasers, the matter of a new contract was frequently the subject of discussion between Fowler and Fites, but Fites on each occasion expressed the view that he stood a better chance of securing such a contract if he could send in an order with the contract. When

the Green order was finally signed, inasmuch as it was conditioned upon the sale by Fowler of Green's old harvester, it did not serve the purpose which Fites had in mind as helpful to securing a new contract. Fites admitted on the stand that he understood that it would be necessary for him to get a new contract for 1923 if he continued to sell the Harris harvester in Imperial County; that he well knew that such a contract could only be executed by one of the officers of the defendant company at Stockton, and that Fowler had no authority to execute such a contract.

It further appears that in conversations with prospects, Fowler on several occasions stated that Fites was or would be the agent for the Harris harvester in Imperial County, and as an inducement to prospective purchasers Fowler stated that Fites would carry in stock extra parts of the Harris harvester.

Subsequent to January 16th, Dossey & Gurisch executed a contract with the defendant company similar in form to that which the plaintiff had for the year of 1922, and proceeded to make the four sales of harvesters, the commission for which is the foundation of the plaintiff's action. One of the four sales was made to Green under a new order obtained directly by Dossey & Gurisch from Green. This order, like the one obtained from Fowler, was conditioned upon Dossey & Gurisch finding a purchaser for Green's old harvester, and not until Dossey & Gurisch had accomplished a sale of the old harvester did Green consummate the purchase. The only possible connection that the plaintiff can urge in relation to any of these four sales is that Fowler had previously secured a written order from Green which was conditioned upon the sale of the old harvester, and that Fites, together with Fowler, had previously interviewed the other three purchasers.

In addition to the matters hereinbefore set forth, which respondent urges tend to support its theory of an implied contract, there are two letters written by L. F. Kidd, of the sales department of the defendant corporation. One was dated January 8, 1923, directed to the plaintiff company and referred to a typewritten price list for the year 1923. The closing paragraph of this letter reads as follows: "Mr. Fowler reports some good prospects in your territory and we sincerely hope he will be of assistance to you in closing

these sales before he leaves the valley.'' The other letter was also from the sales department of the defendant, dated January 18, 1923, and closes with the following language: ''From the reports reaching us from Mr. Fowler there is a good prospect for several sales in your territory and we are hoping that sales will be realized from these prospects.''

Giving full effect to all these circumstances, we do not believe they constitute such a contract of employment as is alleged in count one of plaintiff's complaint. There was no written contract for 1923, nor do we construe the circumstances as sufficient to support an implied contract. Respondent in its brief bases its right to recover upon the legal effect of Fowler's actions and statements and the two letters from the sales department of defendant corporation, but whether it is respondent's theory that these matters operated to effect a renewal of the 1922 contract or a new oral agreement of employment, we cannot determine. The complaint alleged the contract of employment was made in February, 1922, while the findings declare ''that it is true that on or about the 4th day of January, 1923, the defendant employed plaintiff, etc.'' The answer to the first theory is that the contract of 1922 is one of purchase and sale of harvesters and not one of employment. Respondent does not contend that it complied with the provisions of the 1922 contract. Nor in the light of the evidence as to Fites' knowledge of the methods employed by defendant in selling its harvesters and Fowler's limited authority, of which Fites was fully cognizant, can it be successfully urged that plaintiff was employed on January 4, 1923, to act as defendant's agent to sell its harvesters for a compensation of fifteen per cent of the purchase price. Fites testified that he knew this contract of 1922 had expired, and that he was anticipating securing a new contract from the company; that the only kind of a contract he expected to get was one similar to the 1922 contract. There is nowhere in the record the slightest suggestion that Fites ever had been employed by defendant on a commission basis, or that he expected to be employed as an agent on a commission basis; furthermore, it clearly appears that he knew that Fowler had no authority to bind the defendant company on a new contract. Undoubtedly Fites and Fowler, as well as Kidd of the sales department of the defendant company, expected that Fites

would get a new contract for 1923, and upon that expectation Fites unquestionably gave his time and furnished his automobile in an endeavor to interest prospective purchasers in the Harris harvester, but at no point does it appear that Fites was misled by anyone connected with the defendant company into the belief that he already had a contract or that he was to be employed as an agent to sell for the defendant company its products on a fifteen per cent basis. The only contract in Fites' contemplation for 1923 was one similar to the 1922 agreement, which, as we have heretofore stated, is clearly an agreement of purchase and sale.

■ As to the second count, which is based on a *quantum meruit*, the evidence supports respondent's contention that through its president, Mr. Fites, it rendered services to and for the benefit of the defendant and at the request of defendant's agent Fowler, for which he is entitled to a reasonable compensation from the defendant. Fowler was unquestionably the representative of defendant company for the purpose of soliciting orders and rendering field inspection. In the performance of these duties it was necessary for Fowler to have the use of an automobile, and it might be reasonably inferred that he had the authority to secure such aid as was furnished him by Fites in interviewing prospective purchasers. Then, too, the two letters from the sales department of the defendant clearly indicate that the defendant company knew Fowler was working with Fites and really was encouraging Fites to expend efforts with Fowler in securing prospective purchasers. The difficulty, however, arises from the basis urged by respondent and evidently adopted by the court in fixing the reasonable value of the services rendered by Fites. The only evidence offered on this question is the contract of 1922, which apparently respondent interprets as providing for a commission of fifteen per cent on all sales, and the testimony of Fites that farm implement dealers usually were allowed fifteen per cent on all sales made by them when they represented manufacturers. But neither of these methods provided competent or proper evidence of the reasonable value of services rendered by Fites on behalf of his company.

■ Respondent evidently assumes that the fifteen per cent discount allowed in the contract is the proper measure to determine the value of Fites' services. But this clearly

is erroneous, for Fites did not render the services provided in the contract for which the fifteen per cent discount was to be allowed.

Nor does the testimony as to the prevailing commission allowed on sales made by dealers meet the requirements of the case, for the plaintiff made no sales. As we have already pointed out, the transaction that could most nearly constitute a sale was the Green order, and the conditions imposed by Green were never met by the plaintiff company. The true rule would be the reasonable value of the use of plaintiff's automobile when in the service of Fowler, and the reasonable value of the time and services given and rendered by Fites as president of the plaintiff company in aiding Fowler in securing prospective purchasers.

While not important to our conclusion, it may be pointed out that there is a marked inconsistency in the findings of the court in this, that the plaintiff could not recover on a contract as alleged in count one and also on a *quantum meruit* as alleged in count two. If the services claimed were rendered under the contract, there could be no *quantum meruit* basis of action, and, on the other hand, if the services were rendered under the *quantum meruit*, there could be no basis of recovery on contract. The findings declare the existence of both contract and *quantum meruit* right of actions.

For the foregoing reasons, the judgment is reversed.

Houser, Acting P. J., and York, J., concurred.